**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SUZANNE T. MILLER,** | : | **CIVIL ACTION AT LAW** |
| **Plaintiff** | : | **No. 4:CV-04777** |
| | : | |
| **v.** | : | **JUDGE DIAMOND** |
| | : | |
| **ROBERT FORNEY, RON UNGER,** | : | **JURY TRIAL DEMANDED** |
| **JOHN SEITZ, DAN BEERS, KENT** | : | |
| **HERMAN, LEHIGH COUNTY** | : | |
| **HOUSING AUTHORITY, and** | : | |
| **VALLEY HOUSING DEVELOPMENT** | : | |
| **CORPORATION,** | : | |
| **Defendants** | : | |

## ORDER

**AND NOW THIS          DAY OF                    , 2005**, it is hereby ordered that

Defendants' Motion for Summary Judgment on behalf of defendants Robert Forney, Ron Unger,

John Seitz, Dan Beers, Kent Herman, the Lehigh County Housing Authority, and Valley

Housing Development Corporation is DENIED.


By the Court,


_____ J.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUZANNE T. MILLER, | : | CIVIL ACTION AT LAW |
| Plaintiff | : | No. 4:CV-04777 |
| | : | |
| v. | : | JUDGE DIAMOND |
| | : | |
| ROBERT FORNEY, RON UNGER, | : | JURY TRIAL DEMANDED |
| RON ROWE, JOHN SEITZ, DAN | : | |
| BEERS, KENT HERMAN, | : | |
| LEHIGH COUNTY HOUSING | : | |
| AUTHORITY, and VALLEY | : | |
| HOUSING DEVELOPMENT | : | |
| CORPORATION, | : | |
| Defendants | : | |

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

## I.   STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiff became employed by the Lehigh County Housing Authority
(LCHA) in November of 1990 as the Supervisor of the Accounting Department.
(*Plaintiff's Exhibit A*, Miller Deposition, p. 32-33).   Plaintiff also performed duties
for the Valley Housing Development Corporation, which is a non-profit
corporation created to provide incentives to private non-profit groups to construct
affordable housing.   (*Plaintiff's Exhibit B*, Herman Deposition, pp. 18-19).   There
is an agreement between the LCHA and VHDC in which the VHDC leased
employees from the LCHA to perform services.   *Id*.   Plaintiff received her

2

compensation from LCHA, but got bonuses from VHDC.   (*Plaintiff's Exhibit A*, Miller Deposition, p. 53).

In March of 2002, plaintiff became aware that money was being improperly encumbered by the LCHA, at the direction of the Executive Director for the LCHA, plaintiff's supervisor, Defendant Seitz.  *Id*. at 113.  In May 2002, plaintiff became aware that LCHA no longer had money to meet payroll, but was directed by defendant Beers, the other Executive Director of the LCHA who also was plaintiff's supervisor, that she was not to make William Lewis, from HUD, aware of this or any other problems that were going on within the LCHA.  *Id*. at 110-111. Plaintiff was regularly directed to provide false budgetary reports to HUD by defendants Seitz and Beers.  *Id*. at 149-151.  She was personally ordered to change numbers of the budgets any time that the number showed a negative balance, despite the fact that she expressed that she was opposed to providing false information to HUD and believed that the practice was illegal and improper.  *Id*. at 136-137.   When plaintiff would express opposition to these practices, she was yelled at, threatened, and humiliated in front of subordinates.  She never knew from day to day when she went to work what kind of immoral or illegal activity in which she would be forced to participate.  *Id.* at 62.

On March 24, 2003, defendants Seitz and Beers insisted that plaintiff falsify the budget to VHDC.  *Id*. at 114.  The stress placed on plaintiff by defendants Seitz

3

and Beers to engage in these practices was so great that she was forced to take medical leave from that date until May 7, 2003. *Id*. Feeling that her opposition to the improper activities were not being considered by her supervisors, defendants Seitz and Beers, plaintiff sought the assistance of outside agencies and those in authority. In June 2002, plaintiff informed Mr. Lewis of HUD about the encumbrance of public money. *Id.* at 130-131. In summer of 2002, after having to take a leave of absence due to stress motivated by the harassment she received from defendants Beers and Seitz to change the budgetary numbers, plaintiff reported the illegal activities to Ron Miller, a representative of the Shamokin Housing Authority. *Id*. at 138-139. She sent several anonymous letters to the Inspector General of HUD and the Lehigh County Controller. *Id*. at 158, 193. (See, Plaintiff's Exhibit H, Anonymous Letter to Office of Inspector General dated October 17, 2002; Plaintiff's Exhibit I, Anonymous Letter to Office of Inspector General dated October 24, 2002; Plaintiff's Exhibit J, Anonymous Letter to Mr. Peter Shaffer, Lehigh County Controller dated February 12, 2003). Plaintiff urged the recipients of the letters to keep them confidential for fear of retaliatory action by the defendants. (See, Plaintiff's Exhibit J, Anonymous Letter to Mr. Peter Shaffer, Lehigh County Controller dated February 12, 2003). Although the letters were anonymous, plaintiff was sure that the defendants knew that she had sent the

letters because she was the only one who had access to the information in the letters. *Id*. at 158.

On March 13, 2003, plaintiff presented to the VHDC Board information that had not been presented in the budget. *Id*. at 251. Defendant Seitz got angry and said words that were derogatory and humiliating to plaintiff in from of the entire Board for speaking out on matters of public concern. *Id*. at 251 – 252. At that same meeting, defendant Herman yelled at plaintiff for presenting this information, despite the fact that the information was accurate and relevant to VHDC concerns. *Id*.

On that same date, Plaintiff, along with two co-workers met with defendant Forney, the Chairman of the defendant LCHA Board. *Id.* at 261. Plaintiff made defendant Forney aware of the illegal activity being conducted by defendants Beers and Seitz. Id. Defendant Forney refused to investigate plaintiff's claims and stated that Seitz and Beers had children in college and he would not do anything that would keep them from receiving their bonuses. *Id.* at 267. At that meeting, immediately after being presented with the information on the illegal actions of defendants Beers and Seitz, defendant Forney suggested that plaintiff find another position. *Id*. Defendant Ron Unger, an unpaid volunteer of the VHDC Board of Directors, also told plaintiff to get another job and leave. *Id*. at 170. The FBI

became interested in the illegal activity going on within the LCHA and initiated an investigation in July of 2003. *Id*. at 322.

On October 31, 2003, defendant Beers approached plaintiff and demanded that she change the numbers on the budget, as had become his customary practice when the budget was not attractive. *Id.* at 61. He expressed to plaintiff that he couldn't let HUD see how the money was really being spent. *Id*. Plaintiff could no longer endure the stress that she was being subjected to in having to present false information to Federal Agencies and the harassment that she was receiving defendants Beers and Seitz to participate in these activities and terminated her position effective November 6, 2003. *Id.* at 60. Plaintiff had also been subjected on occasion to see pornography on defendant Seitz computer and to witness him fondling himself. *Id*. at 326. As a result of the pressure on the plaintiff, she was forced to leave the job, which in effect was a constructive discharge.

On November 1, 2004, plaintiff initiated this action by filing a complaint against her employers, supervisors and elected officials for violations of First Amendment rights to speak out on matters of public concern without suffering retaliatory reprisals by public employers and policy makers. On numerous occasions from on or before the beginning of 2002, plaintiff complained to her superiors, the individual defendants, and others about unethical and unlawful financial practices used in the administration of LCHA and VHDC.

6

On August 19, 2005, defendants Robert Forney, Ron Unger, John Seitz, Dan Beers, Kent Herman, Lehigh County Housing Authority and Valley Housing Development Corporation filed a Motion for Summary Judgment.  This brief is in opposition to the defendants' motion.

## II.   QUESTIONS PRESENTED

A.   Does the evidence collected for the record support plaintiff's claim for constructive discharge due to the actions of the defendants?

### SUGGESTED ANSWER - YES

B.   Did the actions of the defendants violate plaintiff's First Amendment rights under 42 U.S.C. § 1983 to speak out on matters of public concern without fear of retaliation?

### SUGGESTED ANSWER – YES.

C.   Should the defendants be liable to plaintiff under the theory of civil conspiracy?

### SUGGESTED ANSWER – YES.

D.   Should plaintiff's claims survive the defense of qualified immunity asserted by the defendants?

7

**SUGGESTED ANSWER – YES.**

E.    Should the Lehigh County Housing Authority and the Valley Housing

Development Corporation be held liable for violations of plaintiff's First

Amendment rights?

**SUGGESTED ANSWER – YES.**

## III.    STANDARD OF REVIEW

Summary judgment is appropriate if the "pleadings, depositions, answers to

interrogatories and admissions on file, together with affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is

entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).

The plain language of Rule 56(c) mandates the entry of summary

judgment after adequate time for discovery and upon motion, against a party who

fails to make a showing sufficient to establish the existence of an element essential

to that party's case and on which that party will bear the burden of proof at trial.  In

such a situation, there can be 'no genuine issue as to any material fact' since a

complete failure of proof concerning an essential element of the nonmoving party's

case necessarily renders all other facts immaterial.  The moving party is 'entitled to

judgment as a matter of law' because the nonmoving party has failed to make a

sufficient showing on an essential element of her case with respect to which she

has the burden of proof. *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552 (U.S. 1986).

'The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing that there is an absence of evidence to support the nonmoving party's case." *Celotex* at 2552-2553.

Issues of fact are genuine "only if a reasonable jury, considering the evidence presented, could find the non-moving party." *Childers v. Joseph*, 842 F.2d 689 (3d.Cir. 1988). Material facts are those which will affect the outcome of the trial under governing law. *Anderson v. Liberty Lobby, Inc.*, 106 S.Ct. 2505, 2510 (U.S. 1986). In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56 (3d.Cir. 1988).

## IV.   ARGUMENT

### A.   THE EVIDENCE ON THE RECORD SUPPORTS PLAINTIFF'S CLAIM FOR CONSTRUCTIVE DISCHARGE AS A RESULT OF THE ACTIONS OF THE DEFENDANTS.

The Third Circuit employs an objective test to determine if employee can recover on a claim of constructive discharge. *Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001). The Court must determine whether a reasonable jury could find that the employer permitted conditions so unpleasant or difficult that a reasonable person would feel compelled to resign. *Id.*

In this case, plaintiff has evidence to support the claim that the conditions of her employment were so unpleasant that she would be compelled to resign. In March of 2002, plaintiff became aware that public money was being used as letters of credit to VHDC properties against HUD regulations. (*Plaintiff's Exhibit A*, Deposition of Suzanne Miller, p. 113). Plaintiff also became aware in May 2002 that VHDC could not meet payroll. *Id.* at 103. Others were also aware that illegal activities were being conducted by LHDC and were impacting the plaintiff. Even defendant Ron Unger admitted in his deposition that illegal activity was being conducted by the Board:

> Q.        Sue alleges in her Answers to … Interrogatories that your response to Sue was "Sue the [VHDC Board] is sick and tired of the bickering going on between the employees." She inserts here "insinuating me" and obviously you know, you had your own thoughts in your own mind and she goes on to say "and management". So the insinuating me should not be, obviously, part of anything you said. She goes on to say, this in her Answer to Interrogatory number 11, "my response was 'there's no bickering going on here. There are illegal activities

going on.'"   Ron, did [plaintiff] ever say anything to you about illegal activities?  Did she ever se those words that you can remember?

A.     I don't remember that terminology, no.

Q.     Do you remember any terminology like that?

A.     Like that to me of a legal nature?

Q.     No, not legal.  Do you remember what terminology she used?   Do you remember what terminology she used in response, if indeed the conversation went that way and I'm not implying that it did.  I don't know.

A.     My best recollection is that her comments surrounded tax credit issues that I previously testified to.  I had said to John at one point in time that I do not want to see checks drafted if there aren't sufficient funds in the account even though they're held.  I believe she mentioned that at one point in time to me.  I don't remember ever hearing anything to me that was, that was news that was new, that we weren't already aware of as either a finance committee or a Board….

Q.     Sue alleges that checks were written and that there were representations made on cash available that would not be available if those checks had in fact been sent out and paid for things.  Did that ever occur to your knowledge?  Did you ever find any evidence of that?

A.     As to representations that there were insufficient funds to cover the checks that had been drafted, is that you're asking?...

Q.     In my auditing experience in some ways, but my question is do you know of anything like that ever occurring that you became aware of?

A.     I had asked John, as I recall, outright whether or not checks were being drafted off the system and held pending sufficient funds in the account.  So his answer to that was yes, we occasionally do that.  I voiced to him my concerns as to how that would misrepresent certain balances including accounts payable.

Q.     Yes, sir.

A.     If I were to look at an accounts payable journal subsequent to the drafting of the checks but prior to their

Q.     Being drawn

A.     Being drawn.

11

Q.      Right?
A.      I would have a, in essence an understatement of accounts payable and an overstatement of cash….
Q.      And his response was that that happened from time to time if I understand you correctly?
A.      Yes, and I asked immediately that it cease…

(*Plaintiff's Exhibit D*, Deposition of Ron Unger, p51 – 56).

In addition to being surrounded by the unethical and illegal activity, plaintiff was ordered by the defendant supervisors to participate in it.  Plaintiff was directed by defendant Seitz to change numbers on reports and make false representations to HUD.  (*Plaintiff's Exhibit A*, Deposition of Sue Miller, p. 149-151).  She was yelled at by John Seitz for wanting to present accurate figures on the budgetary reports.  *Id*. at 153.  Plaintiff described in her deposition the effect that this had on her that led her to write a letter to the Department of Housing and Urban Development in October of 2002 about the activities that were going on at the LHDC.

Q.      Was there a precipitating event, straw that broke the camel's back type of thing that led you to write this letter?
A.      The harassment I was getting at work of constantly being asked to continue to mislead Boards, the attitude of management how they didn't care about the place.  Dan had one day said to me, you know all I'm gonna do is put in my thirty-five hours a week and collect as many paychecks as I can before this place collapses.  I mean these were the kinds of comments I was subjected to hearing that management didn't care what was going on there.  Nobody was taking charge or trying to figure anything out and this was kind of seeing that they all went on vacation, enjoyed themselves, had a good time

12

and nonchalantly when I was stuck in my office constantly worrying about the cash situation having people call up, where's my check.  You know the banks calling up, the not knowing or how I was gonna pay the Blue Cross bill.  I wasn't paid enough to have this kind of stress on me.

(*Plaintiff's Exhibit A.*, Miller Deposition, p. 156-157).

In her position as accountant, she was constantly being asked by defendant

Beers to engage in activity that was immoral and unethical.

Q.     Can you tell me an instance in which you were asked to record something that was not correct that was something that had already happened, not a projection?
A.     On the reports to the Board if cash was ever a negative John would come back to me and tell me change the cash back to positive, subtract the expenses out, show less expenses, we don't want the Board to see that we have negative cash in any of our buildings.  That was on a large Excel spreadsheet that I used to do.  Then when we went to having the actual income statement and expense given to the Board rather than a cash statement.

Q.     Which Board?

A.     The VHDC Board.

Q.     Please continue.

A.     He told me make sure you have Larry or you pick out six projects that are not in negative cash.  Pick out six healthy projects and the Board asked them for six particular projects, so there was always twelve reports, but never to show them a project that had negative cash.  So I had to go through this was another thing that caused severe stress on me.  It caused, it was a form of harassment on me that I had 45 projects.  I had to go through if it wasn't on the first statement of reversing cash around, it was trying to find out which projects we could give the Board.  That is what I was told to do with VHDC.  On LCHA, they had to give quarterly reports, I believe to HUD.  In October Dan came to me.

13

Q.     October of

A.     31st, 2003; Dan came to me and said Sue I need the expenditures for the Housing voucher programs.  I gave him check registers and said this is what we have spent in the categories we spent them in.  He came back to me on Monday and said I can't show HUD this; I want you to take out the advances we gave to the general fund.  And those advances were to cover a payroll.  There was no invoice attached to them and he said subtract those out and put in what we should have paid them.  Well, that's a lie because we didn't pay what we should have paid them.  We paid them more than what we should have paid them.  He said cause I have to submit this to HUD.

(Plaintiff's Exhibit A., Miller Deposition, pp. 150-151).

Plaintiff had put the defendant supervisors on notice that she could not handle the harassment she was receiving due to the actions of the defendants.  In her deposition, plaintiff stated:

Q.     To the best of your knowledge does Chris Feiertag still work at the LCHA?

A.     Yes.

Q.     Does Pat Kloss?

A.     Yes.

Q.     Does Barbara Kies?

A.     Yes, I was the only one that was forced to leave.

Q.     Who forced you to leave?

A.     Management

Q.     Management of whom

A.     Dan Beers and John Seitz

Q.     Are you telling me that you were forced to leave by Dan Beers and John Seitz because of your health?

14

A.    The harassment, I told them I could not take any more stress. I could not take any more of the pressure in what was expected of me to do.

Q.    Okay.

A.    I told them I…had lost weight. I told them I was setting a doctor. And the doctor had told me if I lose any more…weight they would hospitalize me.

(*Plaintiff's Exhibit A*, Miller Deposition, p. 162-164).

The effect that the actions of the defendants had upon the plaintiff was evidenced by her co-workers. In her deposition, co-worker Patricia Kloss stated:

Q.    Did Sue ever indicate to you in conversations that she had concerns that she was being asked to do things with numbers that weren't proper or weren't right?...

A.    I remember her mentioning things.

Q.    Did she ever say anything to you, Pat, or in your presence, that she was concerned about her professional credentials because she was being asked to do things or make reports that may not be correct?

A.    I remember her mentioning that. Yes. She was concerned.

(*Plaintiff's Exhibit G*, Patricia Kloss Deposition, p. 140).

Plaintiff was not able to continue working due to the stress she was feeling because of the actions of the defendants in wanting her to participate in activities that she believed to be unethical or illegal. Bill Ricca, plaintiff's husband, remembered the emotional turmoil faced by the plaintiff during his deposition.

15

Q.     Mr. Ricca, when your wife first told you that she had intended to leave her job, what did she tell you at that point, was the reason?

A.     The stress is unbearable.  The dishonesty in the place was hurting her.  She wanted to get good nights sleep.  Her integrity was being reuined.  They were trying to force her to do things that were immoral and illegal and everything else…

(*Plaintiff's Exhibit F*, Deposition of William Ricca, p. 28).

Although plaintiff had expressed previous to her constructive discharge that she found it necessary to leave her employment, she was hoping that things would change that would make her leaving unnecessary.

Q.     [H]ad you already made the decision to resign sometime before you actually did resign and if so when?

A.      No.

Q.     So you decided on November 6th?

A.     No I knew, I knew from my sanity and my health I had to resign about I believe possibly a couple of weeks before.

Q.     Before you actually did.

A.     Right

Q.     I just wanna complete the, what that before was.  Is that correct?

A.     Yes.

Q.     So you knew you had to resign possibly a couple weeks before you did so.

A.     I just didn't know the time frame.  I didn't know when I would resign.  A couple of weeks before I resigned I knew there would come a time when I had to leave.

Q.     That is what I was asking.

A.     A couple of weeks.

Q.     And what was it at that time that led you to know you had to resign, that couple of weeks before?

A.     I saw what the job was doing to me health wise and mentally.  I had lost 15 pounds.  I was on some medication.  I

16

was not sleeping.  I'd wake up with nightmares.  And wasn't
worth my health, no job is.

(*Plaintiff's Exhibit A*, Deposition of Suzanne Miller, pp. 82-84).

Plaintiff's husband also can provide testimony as to the effect that the

circumstances surrounding his wife's employment had on her mental state and her

ability to remain on the job.

> Q.    Do you have a recollection, sitting her today, that one
> month before she resigned, your wife told you she was
> resigning in a month?...
> A.    Let me put it in my own words.  She talked about
> resigning many times, the pressure, the hurt, all of the hassles,
> the problems of getting another job, getting that healthcare to
> cover us.  We spoke about it often.  To put it in a time line, I'm
> not capable.  That I can't tell ya.  With me – was an ongoing
> hell for two years.  What she went through was an ongoing hell
> for two years and I can't pay attention to details of what
> happened when.  There are certain things that stand out in my
> mind and more than that.  I can't tell you.  It's just, she went
> through hell.

(*Plaintiff's Exhibit F*, Deposition of William Ricca, p. 52).

Defendants raise as a defense to plaintiff's termination that she was afforded

protection through the civil service and imply that her leaving the job would not

have been necessary if plaintiff had followed procedures for dismissal provided by

the civil service.  However, the situation in which plaintiff was subjected to at her

employment made it impossible for her to stay in that position.  Her deposition

testimony on the issue was as follows:

Q.     When you resigned from the VHDC and LHCA did you follow the Policy and Procedure Manual for resignations?

A.     No.

Q.     Why didn't you?

A.     I believe the policy and procedure was to give two weeks notice.   I was an emotional wreck.   They had just gotten through asking me to lie to a Federal Agency and they insisted after; after the instructions from the Board to John about not holding checks so that I could submit my reports to the Board on October 31st there was three hundred thousand dollars worth of checks there.   On October 31st Dan Beers asked me for numbers.   I gave him the numbers.   He couldn't let HUD see how we were really spending the money and those were his words, I can't show HUD.

Q.     Just tell me when you're finished.

A.     I'm finished with that part.

MR. BAILEY:      Try to keep your voice up Sue.   I know it's difficult and emotional, but keep your voice up okay.

Q.     So you didn't follow the two-week notice provision because you were an emotional wreck.   Is that your testimony?

MR BAILEY:      Objection, you may respond.

A.     Wouldn't you be if you're asked.

Q.     Is that your testimony now?

A.     Yes, it is.

Q.     Okay.

A.     Because when you're asked to do illegal, unethical and immoral things I never knew from day to day when I went in to work what I would do, be told to do that would compromise my ethics, my morality and that has been proven by HUD.   That almost was done right, that was…illegal.

(*Plaintiff's Exhibit A*, Miller Deposition, pp. 60-62).

Further, the Third Circuit has identified certain circumstances that would

evidence constructive discharge as where 1) defendant threatened to fire the

plaintiff, 2) defendant encouraged the plaintiff to resign and 3) plaintiff was

involuntarily transferred to a less desirable position. *Clowes v. Allegheny Valley Hospital*, 991 F.2d 1159, 1161 (3d Cir.1993).   On March 13, 2003, plaintiff had a meeting with defendant Bob Forney in which he encouraged her to resign. (*Plaintiff's Exhibit A*, Miller Deposition, p. 270) instead of providing assistance to her in stopping defendant Beer's and Seitz's illegal activity.  This conversation and the upsetting effect that it had on the plaintiff was witnessed by Pat Kloss who was also present at the meeting.  (*Plaintiff's Exhibit G*, Kloss Deposition, pp. 16 – 17). Plaintiff was also told by defendant Unger that if she didn't like it she should get another job and leave.  (*Plaintiff's Exhibit A*, Miller Deposition, p. 170).

From all of these facts, a reasonable jury could find that plaintiff's conditions of employment were so unpleasant or difficult that a reasonable person would feel compelled to resign, meeting the standard articulated by the Third Circuit.   As such, defendants' motion for summary judgment on the issue of plaintiff's constructive discharge should be denied.

**B.    THE ACTIONS OF THE DEFENDANTS SUPPORT PLAINTIFF'S § 1983 FIRST AMENDMENT CLAIM THAT SHE WAS RETALIATED AGAINST FOR SPEAKING OUT ON MATTERS OF PUBLIC CONCERN.**

A public employee's claim of retaliation for engaging in a protected activity is analyzed under a three-step process.  *See, Pro v. Donatucci*, 81 F.3d 1283, 1288 (3d.Cir. 1996).   A plaintiff must first demonstrate the activity in question was

protected. *Id.* Second, the plaintiff must show the protected activity was a substantial or motivating factor of the alleged retaliatory action. *Id.* Finally, defendants may defeat plaintiff's claim by demonstrating "that the same action would have been taken even in the absence of the protected conduct." *Id.* While the first factor is a question of law, the second and third factors are questions of fact. *Curinga v. City of Clairton*, 357 F.3d 305, 309 (3d.Cir. 2004).

Only adverse employment actions will give rise to a First Amendment retaliation claim. *Lowery v. Texas A&M University System*, 11 F.Supp.2d 895, 917 (S.D.Tex. 1998). In order for retaliatory conduct to be actionable under §1983, it must be sufficient " 'to deter a person of ordinary firmness from exercising his first Amendment rights." *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000). Thus retaliatory acts committed by public employer must be "more than *di minimus* or trivial." *Brennan v. Norton*, 350 F.3d 399, 419 (3d Cir. 2003). As noted by the Third Circuit, "courts have declined to find that an employer's actions have adversely affected an employee's exercise of his First Amendment right where the employer's alleged retaliatory acts were criticism, false accusations or verbal reprimands." *Brennan*, 350 F.3d at 419. However, criticism, false accusations or verbal reprimands can support a cause of action under §1983 if based upon a continuing course of conduct even though some or all of the conduct complained of would be *de minimis* by itself or viewed in isolation. *Id.* The cumulative

20

impact of retaliatory acts may become actionable even though the actions would be *de minimis* if considered in isolation.  *Id.* at 422.

In this case, plaintiff is alleging that the conduct by the defendants was a continuing course of conduct to which she was subjected.  The fact that she was being forced to continually alter information and engage in illegal activity on a daily basis at the order of the defendants was a continuing course of harassment.  Plaintiff recounted the treatment that she received from the defendants in her deposition.

> Q.   Could you please tell me how you were punished for speaking out on matters of public concern?
> A.   I was yelled out.  I was ridiculed. They said bad; they said nasty things at me at a Board meeting.  They put me on the Family Medical Leave Act.  They induced more and more stress upon me.  And repeated the question once more so I can collect my thoughts again?  How was?
> Q.   It says she was punished for speaking out on matters of public concern.  How were you punished?
> A.   I was threatened….I was told if I didn't like it I could leave my job.  Everyone knew how much I loved that place.
> Q.   Did you finish ma'am?
> A.   For right now.
> Q.   Okay, they yelled at and ridiculed, that was at that finance meeting?
> A.        No, also Dan yelled at me and that I should never contact Bill Lewis.  That was intimidating me, intimidating to me.  And oh my God, what did I do?

(*Plaintiff's Exhibit A*, Miller Deposition, pp. 378-379).

Part of plaintiff's job required her to prepare reports to the Board.  Plaintiff

would prepare reports that contained accurate numbers.  However, every time that the reports to the VHDC Board was negative, defendant Seitz would demand that the plaintiff change the numbers back to positive, subtract the expenses out and show less expenses to make the budget look more financially stable than it actually was.  (*Plaintiff's Exhibit A*, Miller Deposition, pp. 149-151).  This was not an isolated incident, since the reports were prepared on a regular basis.  Plaintiff stated that she did not know from day to day when she went to work, what kind of illegal activity she would be subjected to that would compromise her ethics and morality.  *Id*. at 62.

If the public employee contends that the retaliatory treatment was due to protected speech, the plaintiff must show that the speech dealt with a matter of public concern.  *Connick v. Myers*, 103 S.Ct. 1684, 1689-1690 (U.S. 1983).  If the speech is of public concern, the court must balance the government's interest in the effective and efficient fulfillment of its responsibilities against the employee's First Amendment right.  *Id*. at 1692.

In assessing whether particular speech involves a matter of public concern, the court should examine the content, form and context of the statements.  *Id*. at 1690-1691.  The speaker's motivation is significant insofar as speech by a public employee, relating to his employment is deemed to be of public concern, except when that speech merely deals with personal information.  *Swineford v. Snyder*

*County*, 15 F.3d 1258, 1271 (3d Cir.1994).

The Third Circuit has never assigned a definition to what is exactly a "matter of public concern." *Edmundson v. Borough of Kennett Square*, 881 F.Supp. 188, 193 (E.D.Pa.1995). However, the Third Circuit has found that an employee of the Division of Motor Vehicles speech was a matter of public concern where the employee's comments were motivated by a desire to spotlight potential government wrongdoing. *Czurlanis v. Albanese,* 721 F.2d 98, 100 (3d Cir.1983). Likewise, the Third Circuit has held that speech alleging corrupt practices by government officials was of the utmost public concern. *O'Donnell v. Yanchulis*, 875 F.2d 1059, 1062 (3d Cir.1989).

In this case, the plaintiff made statements to the defendants that expressed that she was opposed to the illegal business practices that they were conducting and in which they were forcing her to participate. She also contacted outside agencies and wrote anonymous letters that could only be traced back to her in an effort to stop the illegal practices. (*Plaintiff's Exhibit A*, Miller Deposition, p. 158, 193). This speech should be considered to be on matters of public concern.

The next step in determining whether the plaintiff's conduct is protected activity under the First Amendment to the United States Constitution, after determining that it is on matters of public concern, is for the court to balance the government's interest in efficient public service against the speaker's First

Amendment rights. *Rankin v. McPherson*, 107 S.Ct. 2891, 2899 (U.S. 1987). In conducting this balance, the court should consider the manner, time, and place of the employee's expression. *Id*. Other significant factors include whether the speech impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, impedes the performance of the speaker's duties and interferes with the regular operation of the enterprise. *Id*.

In this case, plaintiff's speech was made in an effort to promote the efficient public service provided by the government. Plaintiff was attempting to make her defendant supervisors stop engaging in illegal and unethical business practices. Plaintiff's speech was expressed during meetings and directly to her supervisors when she was being told to personally alter information. She was not attempting to impede the harmony among the co-workers. Plaintiff's actions were meant to improve the working circumstances within the offices.

Since plaintiff's speech was on a matter of public concern and outweighs any interest of the government in suppressing the speech, the Court should find that the plaintiff has met the first prong of the Curinga analysis and find that plaintiff's speech was protected under the First Amendment to the United States Constitution.

The second and third prongs of the *Pro* analysis are questions of fact which

must be presented to the jury for determination.  The third prong, of proving that

the discriminatory treatment (of harassing, criticizing and tormenting the plaintiff)

would have occurred in the absence of plaintiff's speech are the burden of the

Defendants to establish at the time of trial.   Plaintiff can present evidence upon

which a reasonable jury could find that the protected activity was a substantial

factor in the retaliatory action as articulated below:

### 1.     Defendant Dan Beers

Dan Beers, plaintiff's immediate supervisor, verbally threatened the plaintiff

and insulted her in front of other employees.  Plaintiff recalled the incident with

defendant Beers that led to her taking off on medical leave from March 2002 to

June 2002:

> Q.     Is that …who used those words massage the numbers?
> A.     Dan
> Q.     What did you understand Mr. Beers meant when he used the term massage the numbers?
> A.     To give a better picture to the Board of what was truly existed there.
> Q.     After being told by Dan to massage the numbers for the budget, what did you do, if anything?
> A.     I told him I wasn't changing numbers.
> Q.     And what did he say in response?
> A.     He said yes you will.
> Q.     And what did you say in response?
> A.     I said I'm not changing numbers, Dan.  Those are my numbers and those are the numbers I believe that are true.
> Q.     And what did he say?
> A.     He said you're gonna do what you're told to do so and I got up. This happened in my office.  It's around noon.  I got up and I walked

25

out and I just said to the two people who were standing there, Marie
Harrison and Janice Harley, I'm out of there.
Q.      What does that mean?
A.      I knew I had to get away, even if it was for lunch or just to
collect my thoughts having just been reprimanded in front of other
employees, in front of my subordinates, in fact, that I would do what I
was told to do no matter what I thought.

(*Plaintiff's Exhibit A*, Miller Deposition, pp. 116-117).

Defendant Beers also threatened plaintiff that she was never to inform
William Lewis from HUD that LHDC was having trouble meeting payroll or
anything else that took place in their office.   *Id.* at 110-111.   Plaintiff was
constantly harassed and yelled at by defendant Beers when she would express
opposition to illegal and immoral practices being employed by him.   Plaintiff
endured this harassment on a daily basis.   *Id*. at 61.   These actions were more than
*de minimus* as described by Brennan, supra.   As such, defendant Beers, should be
liable to plaintiff for violations of her First Amendment rights for retaliating
against her for speaking out on matters of public concern.

## 2.      DEFENDANT JOHN SEITZ

Defendant Seitz was the Executive Director for the LCHA and was
plaintiff's immediate supervisor.   She expressed to him her opposition to illegal
and immoral business practices being conducted at his discretion several times and
he retaliated against her as a result.   Defendant Seitz made demands upon the
plaintiff to change numbers on reports to HUD if cash was ever in a negative, she

26

was directed to change the cash back to a positive, subtract the expenses out, show less expenses. (*Plaintiff's Exhibit A*, Miller Deposition, p. 149-150). This was a continuing course of conduct that was exhibited by the defendant in threatening and intimidating the plaintiff to engage in activity against her will.

Additionally, in July or August of 2002, there was an instance where defendant Seitz verbally insulted plaintiff for not wanting to change the numbers on a budget.

> Q.    There's a reference in your answers to interrogatories that in the summer of '02 John Seitz tried to force you not to report to the Board an encumbrance of a hundred and seven thousand dollars. Do you know what I'm talking about?
> A.    Yes.
> Q.    Do you remember the, what month and year this was? Am I correct it was the summer of '02?
> A.    Yes.
> Q.    Was it August?
> A.    Could have been August.
> Q.    I take it you're not sure.
> A.    Not a hundred percent.
> Q.    Okay, where did this conversation take place?
> A.    In my office after working hours.
> Q.    And tell me what was said?
> A.    I had showed him the budget that I was working on for VHDC. He looked down at the bottom and he said what is this hundred and seven thousand dollars for Sue. And based on what Dan had told me the prior months when I first discovered it and Dan telling me that this money was not allowed to be encumbered by VHDC, I informed John that he had to pay it back. John stood there and argued with me and yelled at me and said take it off the budget Sue. I said I'm not taking it off the budget, John. He said, take it off the budget, Sue. I'm telling you to take it off the budget. And I said no…

27

(*Plaintiff's Exhibit A*, Miller Deposition, pp.152-153).

Defendant Seitz also made intimidating and nasty comments about plaintiff when she tried to provide accurate information to the Board at a meeting on March 13, 2003.

> Q.    Now I want you to tell me as best you can recall the words you used at the finance committee meeting on March 13, 2003 when you raised this issue.
> A.    I believe we were going over the would have been the non IRS non-compliance issues and I pulled out, I said here's another one that we should have to include in the budget that we will most likely be liable to pay the investors back.  And John got, they all were like in shock, more money, more red ink, more bleeding.  John made some kind of comment, don't that exact words.  After he made a comment he said do you see, do you see what she's like, do you see what I have to work with, this is the way she is meaning me.  All I was doing was going by what Bill Lewis had told me in June of 2002, they couldn't afford any more surprises.  You can't.  We were so.
> Q.    Ms. Miller
> A.    Strapped for cash.
> Q.    I apologize for interrupting you but I'm not asking for an explanation.  My question was what was said and if you could do that, I would really appreciate it.  But my question to you is and you've told me so far, what you said, how you brought it up, what Mr. Seitz said, yes?
> A.    Tell  me what else was said as best you remember it, besides what you've already told me.
> Q.    After that Mr. Herman said that I, after John said see this is what she's like, Mr. Herman said to me, said she's not going through the chain of command, this is he yelled at me for bringing it up at the meeting by saying this is not appropriate here or words to that affect that she should go through the chain of command and she didn't.

(*Plaintiff's Exhibit A*, Miller Deposition, pp. 249-251).

Plaintiff did not know on a daily basis what kind of harassment she would be subjected to by defendant Seitz.  *Id*. at 61.  It was a continuous course of conduct on his behalf.  Any time she expressed her opposition to illegal and unethical practices that he was engaging in and in which he was forcing her to participate, he would retaliate against her through insults, yelling at her, and threatening her employment. Plaintiff also was subjected to seeing pornography on defendant Seitz's computer and witness him fondling himself.  *Id.* at 326, 330. As such, defendant Seitz should be liable to the plaintiff for violations of her First Amendment rights for retaliating against her for speaking out on matters of public concern.

## C.   THE DEFENDANTS SHOULD BE LIABLE TO THE PLAINTIFF FOR CIVIL CONSPIRACY UNDER 42 U.S.C. § 1983.

A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties 'to inflict a wrong against or injury upon another,' and 'an overt act that results in damage.'" *Smith v. Wambaugh*, 29 F.Supp.2d 222 (M.D. Pa. 1998).

In order to prove the existence of a civil conspiracy, a plaintiff is not required to provide direct evidence of the agreement between the conspirators;

"circumstantial evidence may provide adequate proof of conspiracy." *Smith* at 222. Absent the testimony of a coconspirator, it is unlikely that direct evidence of a conspiratorial agreement will exist. *Id*. Thus, the question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can "infer from the circumstances that the alleged conspirators had a 'meeting of the minds' and thus reached an understanding" to achieve the conspiracy's objectives. *Id.*

In this case there is sufficient evidence to support that there was a conspiracy among the defendants to retaliate against the plaintiff. The actions of defendant Beers and Seitz, as described above, obviously describe a conspiracy. Additionally, the other defendants provided support for the actions of defendants Beers and Seitz that allowed them to continue their illegal and immoral activities and retaliatory actions against the plaintiff.

Defendant, Kent Herman yelled at the plaintiff when she tried to introduce correct numbers to the VHDC Board and provide the Board with accurate information. Defendant Herman was very protective of defendant Seitz and Beers and, his support, enabled them to continue to engage in illegal and immoral activities. (*Plaintiff's Exhibit A*, Miller Deposition, p. 251-252). Plaintiff believes that defendant Herman's motivation was to embarrass her in front of the VHDC finance committee, to protect defendant Beers and Seitz and to make it look like

the problems with the budget and financial records were the plaintiff's fault. *Id*. at 254.

Defendant Robert Forney, the Chairman of the LCHA Board of Directors, also encouraged defendants Beers and Seitz to engage in their illegal activities. On March 13, 2003, plaintiff had a meeting with defendant Forney in which she informed him of the illegal activity that was being conducted by Beers and Seitz. *Id*. at 261. When she informed him that defendant Seitz asked her to falsify financial reports to the Board defendant Forney responded that was only a little bit of finangling of numbers. *Id*. at 267.

Defendant Forney refused to investigate the matter further and responded that defendants Beers and Seitz had children in college, so they needed the bonuses from the VHDC. *Id*. at 268. Before even hearing the concerns of the plaintiff, he informed her that he would not considering firing either defendant Beers and Seitz. *Id*.

Defendant Ron Unger also supported the decisions of defendants Beers and Seitz by advising plaintiff that she should find a new job when presented with evidence of the wrongdoing that was transpiring with the accounting practices of LCHA at the defendants' direction instead of taking measures to cease the illegal activity. *Id*. at 170. The defendants assert that defendant Unger should not be liable to the plaintiff under a claim for conspiracy under 42 U.S.C. § 1983 as

31

Unger is a unpaid volunteer of the VHDC Board and they claim him not to be a state actor.   While plaintiff contends that Unger is a state actor through his participation on the VHDC Board, liability can be imposed upon a person who is not a state actor, if the plaintiff can establish must claim that "[t]he private actor…wrongfully influence[d] the state actor's decision…through a conspiracy…" *Davis v. Union National Bank*, 46 F.3d 24,26 (7th Cir.1994).  Under the conspiracy theory, a private party may be liable under 42 U.S.C. § 1983 if he was acting "in concert" with public officials. *Jennings v. Shuman*, 567 F.2d 1213, 1220 (3d Cir.1977).  The conspiracy theory focuses on the relationship between the public and private entities being charged with the §1983 violation.  For example, the United States Supreme Court found that a restaurant could be charged with acting under color of state law if the defendant had an "understanding" with a city policeman to deny plaintiff service or to cause plaintiff's arrest due to her association with black people. *Adickes v. S.H. Kress and Co.,* 90 S.Ct. 1598 (U.S. 1970).

There are sufficient facts from which a jury could determine that the defendants engaged in a civil conspiracy against the plaintiff.   Through the support of defendants Herman, Forney and Unger, defendants Beers and Seitz were able to continue falsifying budgets and manipulating accounting figures involving public agencies.  In considering the evidence in the light most favorable to the non-

32

moving party, the Plaintiff, the facts and the law that have been established by Plaintiff in this case do not support the grant of summary judgment. Therefore, Defendants Motion for Summary Judgment should be denied.

### D.    DEFENDANTS SHOULD NOT BE ENTITLED TO THE DEFENSE OF QUALIFIED IMMUNITY.

Government employees are shielded from suit if their conduct did not violate a "clearly established statutory or Constitutional right of which a reasonable person would have known." *Saucier v. Katz*, 533 U.S. 194, 200-01(2001). To gain the protection of the defense, the Defendants must prove that: (1) the Plaintiff has not demonstrated "a deprivation of an actual Constitutional right" or (2) that the right at issue was not "clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999).

Public employees possess a constitutional right to express themselves on matters of public concern, free from fear of retaliation. *See, e.g. Connick v. Myers*, 103 S.Ct. 1684, 1688 (U.S. 1983). "Statements by public officials on matters of public concern must be accorded First Amendment protection." *Pickering v. Board of Educ. of Township High School*, 88 S.Ct. 1731, 1744 (U.S. 1968).

The Plaintiff should not be barred from bringing her case to trial due to the defense of qualified immunity. Defendants have failed to prove that Plaintiff was not deprived of an actual Constitutional right. As a public employee, Plaintiff's

action of speaking out about the illegal activity being engaged in by the individual defendants must be granted First Amendment protection. Since the activity for which the Plaintiff was retaliated against (providing witness testimony) is protected by the First Amendment to the United States Constitution, the Defendants have not proven that Plaintiffs have not demonstrated a deprivation of an actual Constitutional right.

Defendants have also failed to prove that the right at issue did not exist at the time of the violation. Clearly, it was a violation of First Amendment rights to retaliate against someone who spoke out on matters of public concern at the time that the defendants harassed threatened and intimidated the plaintiff when she spoke out on matters of public concern. As such, defendants are not entitled to the defense of qualified immunity.

> **F.   DEFENDANTS LEHIGH COUNTY HOUSING AUTHORITY AND VALLEY DEVELOPMENT CORPORATION SHOULD BE HELD LIABLE FOR VIOLATIONS OF PLAINTIFF'S FIRST AMENDMENT RIGHTS SINCE THE HARM TO PLAINTIFF WAS CAUSED BY A GOVERNMENT POLICY, CUSTOM OR PRACTICE.**

The United States Supreme Court has held that a municipality may be held liable for the unconstitutional acts of a state actor if the harm was caused by a government policy, custom or practice. *Monell v. City of New York Dept. of Social Services*, 436 U.S. 658, 690-691

34

(U.S. 1978).   Municipal liability can arise out of a widespread longstanding, informal custom or policy.  *Id*. at 691.  Municipal liability can also be established through the decisions of officials with policymaking authority.  *Pembaur v. City of Cincinnati*, 106 S.Ct. 1292 (U.S. 1986).  Liability under *Pembaur* is established when a decisionmaker with final authority acts in a manner that violates a constitutional right.  *Id*. at 1292.  A single decision maker may establish municipal liability.  *Id*.  In *Pembaur*, a single decision of a county prosecutor to authorize an unconstitutional entry into the plaintiff's clinic was enough to establish municipal liability.  If the relevant policymaker and the policy are established, a plaintiff still must demonstrate that the policy caused the constitutional injury, see *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir.1990), and that the municipal action was taken with deliberate  indifference to its known or obvious consequences.  *Bryan County v. Brown*, 117 S.Ct. 1382, 1392 (U.S. 1997).

In this case, the defendants Beers and Seitz were employees of Lehigh County Housing Authority and contracted to do work for the Valley Housing Development Corporation.  As has previously been stated, defendant Seitz made it a practice to come to plaintiff and intimidate her into changing the numbers on her budgetary reports anytime that the amounts reflected a negative balance.  Beers also made it a habit of continually asking the plaintiff to change numbers on the budgets.  Plaintiff was subjected to this kind of intimidation and harassment on a

continual basis.  Plaintiff testified that when she reported to work she did not know what immoral or unethical practice she would be asked to perform that day.  It had become an established practice for the policymakers (Beers and Seitz) to engage in illegally     changing     the     numbers     on     the     budgets.

Defendants claim that defendant Valley Housing Development Corporation should not be liable to plaintiff for the violations of First Amendment rights as she was not their employee at the time of the incidents.   However, the evidence supports the finding that plaintiff actually was employed by the VHDC.   As testified to by Kent Herman, there is an agreement between LCHA and VHDC in which VHDC leased employees from the LCHA to perform services.  (*Plaintiff's Exhibit B*, Herman Deposition, p. 34).   Herman stated that Ms. Miller, as did practically every employee of LCHA performed work for VHDC.   *Id*.   The agreement is still in effect.   *Id.*

As such, both LCHA and VHDC should be liable for allowing the illegal practices which caused the violations of plaintiff's First Amendment rights. Therefore, defendant's motion for summary judgment against LCHA and VHDC should be dismissed.

## V.    CONCLUSION

For the foregoing reasons, it is respectfully submitted that Defendants

Motion for Summary Judgment should be denied.


Respectfully submitted,

s/Don Bailey
Don Bailey, Esquire
Attorney ID 93285
4311 North Sixth Street
Harrisburg, PA  17110
(717) 221-9500

## CERTIFICATE OF SERVICE

I, Don Bailey, Esquire, hereby certify that on this 6th day of September, 2005, a true and correct copy of the foregoing Brief in Opposition to Defendant's Motion for Summary Judgment was served upon the below-named defendants via electronic means addressed as follows:

Joseph Goldberg, Esquire
Weber, Gallagher, Simpson, Stapleton, Fires & Newby, LLP
2000 Market Street, 13th Floor
Philadelphia, PA  19103

Respectfully submitted,

s/Don Bailey
Don Bailey, Esquire
Attorney ID  23786
4311 North Sixth Street
Harrisburg, PA  17110